IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00726-MEH

MALON DEAN TYGRETT,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER ACTING BY AND THROUGH ITS BOARD OF WATER
COMMISSIONERS a/k/a Denver Water,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

     Plaintiff in this case was a senior equipment operator for Denver Water, with whom he was employed over twenty years. Denver Water terminated his employment on August 22, 2017, citing instances of misconduct, primarily rude and dangerous behavior toward the public and conflicts with his co-workers. Plaintiff contends that Denver Water discriminated against him because of his disability, failed to accommodate that disability, and terminated him in retaliation for his protected activity. Denver Water now moves for summary judgment on all claims. ECF 83.

## FINDINGS OF FACT

     The Court makes the following findings of fact viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.

     Plaintiff objects to numerous facts on the sole ground that they are supported by the affidavit of Tom Roode, chief of operations and maintenance at Denver Water from 2011 to the present, who Plaintiff argues relies on hearsay and cannot have personal knowledge of the facts he

avers.  The Roode affidavit explicitly states that it is based on personal knowledge, and under Fed.

R. Civ. P. 56(e) and Fed. R. Evid. 602, that suffices.  Therefore, I do not view Plaintiff's blanket

objection as controverting the facts stated.  However, I will assess whether, in each instance, Mr.

Roode was in the position to have personal knowledge of the facts he presents.  *See Argo v. Blue*

*Cross & Blue Shield of Kansas, Inc*., 452 F.3d 1193, 1200 (10th Cir. 2006) ("Under the personal

knowledge standard, an affidavit is inadmissible if '"the witness could not have actually perceived

or observed that which he testifies to."'  . . .  Accordingly, at the summary judgment stage,

'statements of mere belief' in an affidavit must be disregarded.") (citations omitted).[1]  Further,

"'hearsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat

summary judgment.'"  *Li Zu v. Avalon Health Care, Inc*., 806 F. App'x 610, 623 (10th Cir. 2020)

(citation omitted).

1.     Plaintiff worked for Denver Water for over 20 years. One of Plaintiff's primary job duties

as a senior equipment operator was to drive a semi-truck with a trailer attached, also referred to as

a "lowboy."  The lowboy is very large and can be dangerous.

2.     Denver Water received two complaints in 2014 concerning Plaintiff; the complaints came

from customers who believed Plaintiff engaged in rude behavior.  The complaints were

documented in Plaintiff's 2014 performance evaluation, as follows: "Dean had two complaints in

2014 with customers that he was rude with them[.] [W]e did address the issue with Dean.  [T]his

---

[1] I am aware of decisions holding that just as a corporation may "educate" a witness and designate
him or her as the corporate spokesperson at a Fed. R. Civ. P. 30(b)(6) deposition, so may a party
"educate" a declarant and submit a declaration in support of a summary judgment motion.  *E.g.,*
*Harvey v. THI of New Mexico at Albuquerque Care Ctr., LLC*, No. 12-cv-727 MCA/LAM, 2015
WL 12659914, at *20 (D.N.M. Mar. 31, 2015).  I do not believe this proposition is sound in light
of the *Argo* opinion.

did lower his rating from consistently exceeds to fully meets[.]" Plaintiff did not file an objection to this evaluation.

3.      Any time Plaintiff had restrictions due to a work-related injury prior to 2015, Denver Water provided an accommodation, including light duty work in its warehouse.

4.      Plaintiff suffered an on-the-job injury on March 4, 2015, when he slipped on ice at work while climbing into a loader. He injured his back, hip, neck, head, and sciatic nerve.  Dr. Hugh Macaulay treated Plaintiff and placed him on restrictions following the incident.

5.      Each of Plaintiff's restrictions following the March 4, 2015 injury were accommodated by Denver Water. Specifically, Denver Water accommodated Plaintiff by assigning him to a temporary position to drive a truck in the Fleet Department, which he was able to do without any issues. In addition, Plaintiff was placed on modified duty with varying weight and standing restrictions.[2]

6.      Plaintiff was released from all restrictions on July 27, 2015 and placed back on restrictions on December 7, 2015.

7.      In the fall of 2015, Plaintiff was counseled about a driving incident in which Denver Water asserted he acted aggressively, tailgated another driver, and blew his horn. Plaintiff denies he acted aggressively.

8.      Plaintiff's 2015 performance evaluation documented that some Denver Water employees indicated they were uncomfortable in the working situation Plaintiff created because he "tends to

---

[2] Plaintiff asserts, without evidentiary support, that in July 2017 Denver Water assigned him to perform laborer duties in excess of certain "permanent restrictions."

worry about what others are and aren't doing" which had a "direct effect and negative impact on" Denver Water's goals.[3]  The evaluation rated Plaintiff as "fully meets standards."[4]

9.     In January 2016, Plaintiff had a meeting with his supervisors and a nurse at Denver Water to discuss issues he was having with his job duties and to identify an appropriate accommodation. Following the meeting, Denver Water accommodated Plaintiff's needs by restricting his driving time to a maximum of thirty minutes at a time.

10.     On February 17, 2016, Plaintiff had a follow-up visit with Dr. Macaulay.  In the follow-up visit medical notes, Dr. Macaulay stated he told Plaintiff that Denver Water "had indicated a desire to work with [him]."

11.     Plaintiff admitted that, on February 17, 2016, he had no reason to question the truthfulness of Denver Water's desire to work with him on restrictions and accommodations and that Denver Water had been working with him to date.

12.     As of March 2, 2016, Dr. Macaulay stated that Plaintiff was on "[r]egular duty," with no restrictions noted.  Dr. Macaulay told Plaintiff that if he had work restrictions, that would preclude him having a commercial driver's license (CDL), and that Plaintiff's job required having a CDL. Thus, Dr. Macaulay told Plaintiff "the best alternative for him was to continue [his] job without restrictions and try to work out some of the other issues."

---

[3] Plaintiff objects to the performance appraisal as inadmissible hearsay but, based on the record before me, it likely constitutes a record of a regularly conducted business under Fed. R. Evid. 803(6).
[4] Plaintiff proposes other facts concerning Plaintiff's positive performance; however, because Defendant's termination decision is based on conduct and not performance, I do not find them relevant for this summary judgment motion.

13.     Plaintiff did not ask explicitly for additional accommodations but wanted the job of equipment operator to avoid hurting his back. The equipment operator job responsibilities were not within Plaintiff's physical capabilities.

14.     In 2016 and following the March 4, 2015 injury, Plaintiff applied for a Foreman position that he did not receive. However, even before his injury, Plaintiff had previously applied for such a position during the course of his employment and was never hired into same. Plaintiff conceded that part of the reason he never received the position in the past was because he "wasn't the greatest reader or speller." The individuals who became foremen were qualified.

15.     During this timeframe, Plaintiff also applied for an operator position. Plaintiff admitted that he could not adequately perform the job duties of an operator because of his restrictions. Nevertheless, Denver Water offered Plaintiff a junior operator position. Plaintiff did not accept the position due to a three-dollar reduction of pay, and there were no other open positions at the time which would have been equal pay to Plaintiff's then-current position.

16.     Plaintiff also applied for an inspector position but conceded that the person who received the position was qualified and a good, hard worker. Similar to the operator position, Plaintiff had applied for an inspector job prior to 2015 but was not hired into the position due to his lack of schooling.

17.     Plaintiff applied for a position in the service department but, again, he conceded that he was not hired into the position because of his spelling and reading capabilities.

18.     Denver Water was aware in August 2016, that its employee, Greg McCambridge, "expressed concern to the point of fear of [Dean Tygrett]," and indicated that Plaintiff "has regular

outbursts of anger that are directed at just about everyone." Plaintiff was aware that McCambridge expressed concern about him to the point of fear.[5]

19.     Denver Water was aware in August of 2016, that its employee, Mark Cripps (Plaintiff's supervisor), indicated that Plaintiff "[c]reates an unsafe environment because he works way too fast" and that he has witnessed Plaintiff "blow up at people."

20.     Denver Water was aware in August of 2016, that its employee, Gary Miller, reported that Plaintiff exhibited anger towards employees, got frustrated, and created an unpleasant environment.

21.     Denver Water was aware in August of 2016, that its employee, Lisa Salazar, reported that Plaintiff exhibited frustration and can be loud.

22.     Denver Water was aware in August of 2016, that its employee, Kenny Palumbo, reported that a few weeks earlier, he watched Plaintiff come "through the yard in a semi, going super fast, came around by the gate, stopped, [and] got out cussing and screaming . . . [H]e had to shut the gate, a Mortenson employee was surveying . . . Dean was waiving his hands and throwing the f-bomb five or six times directed at the Mortenson employee [and] [t]he employee moved the golf cart while Dean was still waiving his hands and throwing the f-bomb." Palumbo further reported that the way Plaintiff works "is not safe," that he "creates a negative environment" which no one wants to be around, and that "he has no consideration for safety."

23.     Following the employee reports and an investigation into the incident, Denver Water held a corrective action conference with Plaintiff on August 24, 2016.  Also on that date, Jessica

---

[5] Plaintiff objects to numbered facts 18–22 as supported by unsworn written statements.  I will not accept these statements for the truth of the matter, but for the effect they had on the listener, which means, for present purposes, they are not inadmissible hearsay.  *E.g., Jones v. McHugh*, 604 F. App'x 669, 672 n.2 (10th Cir. 2015).

Thompson, a Denver Water occupational nurse who works with worker's compensation patients, advised Plaintiff's supervisor, Jack Tolmich, that Dr. Macaulay would soon be addressing whether Plaintiff had a need for permanent restrictions.  Tolmich stated that if Plaintiff did have permanent restrictions, Denver Water would likely be unable to accommodate them.

24.     A written "notice of corrective action conference" identified the following violations by Plaintiff of Denver Water policies: (1) violation of safe working practices or safety rules or regulations; (2) conduct which does or could result in a material impairment of the efficiency of the employee's work or the work of others; (3) disruptive behavior which includes vulgar, threatening, insulting or abusive language or conduct that disturbs, offends or is likely to disturb or offend another person; and (4) violation of provisions of the Personnel Policies, Enterprise Policies, or other Denver Water Policy.

25.     When describing the incident with the Mortenson employee, Plaintiff stated that he approached the employee, asked her to move her vehicle, but when she ignored him, he moved closer to her and continued to state that she needed to move her vehicle. Plaintiff admitted that he has a tendency to act loud and waive his hands. Plaintiff further admitted use of the "F" word could be perceived as an expression of anger.

26.     During the August 24, 2016 conference, Denver Water advised Plaintiff that if he was in pain, he was encouraged to seek medical advice and care, and that if he would like to seek an accommodation to contact the appropriate individual.

27.     On August 30, 2016, Plaintiff was suspended from work without pay for three days for the abovementioned incident. Plaintiff did not appeal the decision.

28.     Plaintiff had a functional capacity evaluation (FCE) on September 12, 2016 performed by Amy Camargo, P.T.  According to the FCE, Plaintiff "did not demonstrate the ability to meet the

physical demand requirements of a Driver/Operator based upon the job description provided by the employer. He did not meet the sitting demand . . . [and] demonstrated the ability to occasionally lift up to 50 lbs. Floor to Waist, 30 lbs. Waist to Shoulder, carry up to 30 lbs., push 83 lbs. of force, and pull 83.9 lbs. of force." On September 26, 2016, Dr. Macaulay told Plaintiff he had passed the FCE (*i.e.*, could perform his job with no restrictions). Thereafter, there is no evidence Plaintiff ever specifically asked for any additional accommodations, but he did tell Denver Water he "was still hurting."

29.     Plaintiff understood that he was responsible for communicating with his supervisors about any physical issues he was having.

30.     Plaintiff's 2016 performance evaluation noted: "You always work swiftly on your tasks but have been cautioned on more than one occasion for driving too fast and in an unsafe manner. Jim Due [sic], Jack Tolmich and I have all verbally counseled you about your speed. Additionally, you received a speeding ticket while operating a Denver Water vehicle. This is unacceptable, and while your driving has improved, you still need to slow down and not move too quickly. Fast/quick maneuvers and quickly accelerating to the speed limit or hard braking to a stop is very dangerous, even if not exceeding the speed limit." The 2016 evaluation had several references to Denver Water's goal of reducing job injuries and "downtime days." Denver Water also gave Plaintiff individual goals of working toward "unrestricted work." Plaintiff received a "does not fully meet standards" in the area of individual goals relating to reducing work restrictions.

31.     Plaintiff was not under any restrictions when the 2016 performance evaluation was completed.

32.     Plaintiff filed an objection to his 2016 performance evaluation, which was ultimately upheld after a meeting in which Plaintiff presented his perspective and cited evidence as to why the evaluation should be changed.

33.     As of July 13, 2017, Plaintiff was not working under any physical restrictions, although in January 2017, an independent medical examination performed by Dr. J. Stephen Gray (at Plaintiff's request for purposes of obtaining necessary care and treatment, as part of Plaintiff's worker's compensation case) stated that he should at that time be limited in how much weight he could lift, carry, push or pull.  Dr. Stephen Danahey, who by that time had become Plaintiff's treating physician for his worker's compensation claim, did not adopt the suggested restrictions but did inform Plaintiff that the restrictions would have placed him in a medium-duty category with some recommended permanent restrictions.  On that same date of July 13, 2017, Plaintiff reported to Dr. Danahey that he had ongoing pain and discomfort in his lower back.

34.     Dr. Danahey did not give Plaintiff any restrictions and stated that he could do his regular job duties without them.  Indeed, Denver Water returned Plaintiff to his normal job duties, and he was performing those duties on July 25, 2017 and July 28, 2017 (Plaintiff called in sick on July 26–27, 2017).[6]  The record contains no evidence that Plaintiff requested restrictions.

35.     On July 28, 2017, while assigned to his regular truck driving duties, Plaintiff was involved in an incident with a contractor in which the contractor impeded Plaintiff's vehicle, upon which Plaintiff blew his horn and waived his hands several times to get the contractor to move the latter's vehicle.  During this incident Plaintiff was alleged to have driven the lowboy in a dangerous and

---

[6] The parties dispute whether, at this time, Plaintiff was also required to perform duties outside his regular job and whether those extra duties caused him injury resulting in the sick days.

unsafe manner as we went by the contractor's vehicle.  He did not use profanity and did not exit his vehicle.  He did drive very close to the contractor's vehicle but did not make contact.

36.     Plaintiff was taken off driving duties on July 31, 2017, while the incident with the contractor was being investigated. On July 31, 2017, Plaintiff was assigned to help move items from one building to another. Plaintiff completed his tasks that day, did not ask for any accommodation based on the assignment, and did not tell any supervisor he was in pain or needed to stop working, although he did tell the supervisor he could not do "the heavy moving because of [his] back."  Nevertheless, Plaintiff's "boss" told him he was under no work restrictions and needed to do his job. Plaintiff saw Dr. Danahey on August 3, 2017 for his pain; Dr. Danahey recommended physical restrictions.  Plaintiff's supervisor was informed that date of the recommended restrictions and was queried whether the restrictions can be accommodated.  Plaintiff's supervisor stated Plaintiff would be accommodated.

37.     Plaintiff took paid time off until August 7, 2017 due to the hurting back occasioned by his work on July 31, 2017. Upon his return, Plaintiff received a notice of corrective action following Denver Water's investigation. Specifically, Plaintiff's behavior on July 28, 2017, violated several of Denver Water's personnel policies, including a violation of safe working practices or safety rules or regulations and disruptive behavior which includes vulgar, threatening, insulting or abusive language or conduct that disturbs, offends, or is likely to disturb or offend another person.

38.  An August 3, 2017 physician's report of worker's compensation injury form placed Plaintiff on temporary restrictions with a lift/push/pull five-pound maximum and restrictions of "walk 1 hour, stand 3 hours, sit 4 hours – no commercial driving." Defendant was informed of this information that same day when Jessica Thompson told Mark Cripps of the doctor's visit and limitations.  The form also notes that the examining doctor, Dr. Danahey, was informed "that some

disciplinary action is being taken relating to an unrelated issue." When Plaintiff returned to work on August 7, 2017, he was under temporary work restrictions for three days, which Denver Water accommodated by placing him on light duty. At that time, Denver Water provided Plaintiff with all accommodations requested.

39.     On August 7, 2017, Plaintiff was provided a "Notice of Corrective Action Conference" which set a hearing date of August 14, 2017 and notified Plaintiff that he would either be suspended without pay (or lose vacation time) for more than three days; he would be demoted; or he would be terminated. In accordance with this Notice, a division conference was held with Plaintiff on August 14, 2017, related to the July 28, 2017 incident.

40.     At the division conference, Plaintiff admitted that the contractor was in a location which impeded his ability to make a turn in the lowboy. Instead of getting out of his vehicle and asking the contractor to move the vehicle, Plaintiff conceded that he honked his steering wheel horn while he was waiving his hands and telling the contractor to move out of the way.

41.     In a decision letter dated August 22, 2017, Denver Water stated that, during the division conference, Plaintiff acknowledged he can be "loud" and "direct" in his communication with others, and that he could be seen as "aggressive." He stated that he believes "some people are too sensitive and [he] hurt[s] their feelings."

42.     Plaintiff was terminated from his position as a senior equipment operator with Denver Water in the decision letter. Denver Water asserts the decision was based on the totality of the evidence including witness information, Plaintiff's information, and Plaintiff's pattern of behavior without improvement.

43.     Plaintiff appealed his termination, which resulted in a two-day hearing. Following the hearing, conducted by a neutral officer, Plaintiff's termination was upheld.

44.     Some non-disabled Denver Water employees were issued driving violations and/or were involved in accidents without being terminated.  Further, there have been thirty-two non-disabled employees supervised by the same persons as Plaintiff who had verified policy violations (unrelated to the violations Plaintiff allegedly had) who were not terminated.  Several of these involved insubordination, crudeness, profane language, or threatening behavior.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).  "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment."  *Id*. at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)).  Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *Johnson v. Weld Cty., Colo*., 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

### I.   Termination Based on Disability

At summary judgment, Plaintiff relies on circumstantial (non-direct) evidence that he was terminated because of his disability under the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. §§ 12181 *et seq.*; therefore, the *McDonnell Douglas* burden-shifting framework governs the analysis of this claim. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538

(10th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).  The framework involves three elements:

> (1) the plaintiff must establish a prima facie case of discrimination . . . ; (2) the defendant employer must offer a legitimate non-discriminatory reason for the adverse employment action; and (3) the plaintiff must show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual.

*Smothers*, 740 F.3d at 538.  To establish the first *McDonnell Douglas* element—a prima facie case—a plaintiff must present evidence that "(1) he is disabled within the meaning of the ADAAA; (2) he is qualified to perform the essential functions of his job with or without accommodations; and (3) he was terminated 'under circumstances which give rise to an inference that the termination was based on his disability.'"  *Id.* at 544 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).  Here, Denver Water argues that Plaintiff fails to demonstrate genuine issues of material fact as to the first and third prongs of his prima facie case.

A. <u>Whether Plaintiff Was Disabled</u>

To meet his burden of showing he is disabled under the ADAAA, "[a] plaintiff may show either: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Smothers*, 740 F.3d at 544 (quoting 42 U.S.C. § 12102(1)).  Plaintiff relies on (A), an actual disability, which requires that a plaintiff "must articulate with precision the impairment alleged and the major life activity affected by that impairment." *Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.*, 168 F.3d 1228, 1232 (10th Cir. 1999).  To show the existence of a physical impairment that substantially limits a major life activity, a plaintiff must: (1) show he has a recognized impairment; (2) identify one or more appropriate major life activities; and (3) show that the impairment substantially limits one or more of those activities. *Crowell v.*

*Denver Health and Hosp. Auth.*, 572 F. App'x 650, 657 (10th Cir. 2014). Whether a plaintiff has an impairment within the meaning of the ADAAA and whether the conduct affected is a major life activity is a question of law for the court to decide. *Id.* at 1191. While "whether the impairment substantially limits the major life activity is generally a factual question for the jury, in proper circumstances a court may decide this step on a motion for summary judgment." *Tone v. Reg'l Transp. Dist. (RTD),* 447 F. Supp. 2d 1187, 1192 (D. Colo. 2006).

Plaintiff alleges he had a back injury that impaired the major life activities of lifting, sitting, standing, and working.  A back injury qualifies as a potential disability under the ADAAA. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979 (10th Cir. 2019).  Lifting, sitting, standing, and working are major life activities.  Plaintiff must provide sufficient evidence that he is substantially limited in one of these areas. *See Felkins v. City of Lakewood*, 774 F.3d 647, 651 (10th Cir. 2014) (plaintiff "had to present sufficient evidence to prove (1) that she has a condition . . . (2) that substantially limits at least one of her five identified major life activities").

Defendant argues first that Plaintiff "cannot make a substantial showing of impairment as of July 28, 2017-July 31, 2017 when he was removed from driving duties due to his behavior—the event that ultimately led to his termination."  Motion at 15.  This statement does not accurately reflect the facts or Defendant's burden on summary judgment for several reasons.  Number one, Denver Water terminated Plaintiff on August 22, 2017, more than three weeks after the incident. In the time period between July 31 and August 22, 2017, Plaintiff had another back-worsening event, Denver Water was informed of new work restrictions that needed accommodating, and Denver Water accommodated those restrictions.  Further, the record shows back issues beginning no later than March 2015, including a worker's compensation case.  With medically documented back issues predating and postdating July 28–July 31, 2017, I cannot, on this record, find as a

matter of undisputed fact that for those four fateful days, Plaintiff was not disabled. Doctors told him he was restricted in various activities such as sitting and lifting.

The issue of substantial limitation, a prerequisite to a finding of disability, is a different matter. Whether Plaintiff was *substantially* limited in a major life activity is generally, as Defendant admits, a jury question except in "proper" (or limited) circumstances. Deciding this issue on summary judgment can be an extremely fact-intensive endeavor yet, as noted below, the inquiry expressly "should not demand extensive analysis."

Federal regulation outlines the standards for the "substantially limited" inquiry:[7] (1) "'[S]ubstantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the [ADAAA] . . . [and] is not meant to be a demanding standard." [29 C.F.R. § 1630.2(j)(1)(i)]; (2) A substantial limitation is viewed in comparison "to most people in the general population.   An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability . . . ." [*id.* § 1630.2(j)(1)(ii)]; (3) A court's primary attention in a disability case is whether the employer has "complied with [its] obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis." [*id.* § 1630.2(j)(1)(iii)]; (4) "The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term 'substantially limits' shall be interpreted and applied to require a degree of

---

[7] I note that the Tenth Circuit cites these regulations as the source of authority for this analysis. *Crowell*, 572 F. App'x at 658.

functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." [*id.* § 1630.2(j)(1)(iv)]; (5) "The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis." [*id.* § 1630.2(j)(1)(v)]; (6) "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." [*id.* § 1630.2(j)(1)(vii)].   In addition, concerning the condition, manner, or duration of the alleged limitation, federal regulation requires consideration of "the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function." *Id.* §§ 1630.2(j)(4)(i-ii).

As Plaintiff argues, the ADAAA, at the very least, clarified the standard and, in fact, stated that the new articulation of functional limitation "is lower than" the prior standard.  Thus, it is most helpful to consider cases postdating that amendment.  Yet even after the amendment, "not every impairment" is a disability.  For example, a medical diagnosis, without more, "establish[es] only that [a] plaintiff suffered an impairment," and "not that his ability . . . was substantially limited by that impairment." *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 136 n.10 (E.D.N.Y. 2015). Further, evidence that an impairment is temporary still makes it less likely that the plaintiff is disabled. *Robles v. Medisys Health Network, Inc.*, No. 19CV6651ARRRML, 2020 WL 3403191, at *6 (E.D.N.Y. June 19, 2020) (citing cases).  However, evidence that a plaintiff can still perform the essential functions of his job and is working with no restrictions does not undercut a claim of disability.  *Williams v. Tarrant Cty. Coll. Dist.*, 717 F. App'x 440 (5th Cir. 2018), *reh'g denied* (Feb. 20, 2018).  Yet, in a post-2008 case, the Tenth Circuit appeared to require that a plaintiff

submit evidence of the impact of her alleged disability when compared with the general population. *Crowell*, 572 F. App'x at 658.  The court in that case certainly engaged in a detailed discussion of the plaintiff's functional limitations despite the regulation's admonition that the "substantially limited" inquiry "should not demand extensive analysis."

A lifting restriction is fairly common in ADAAA cases.  In *Cruz v. R2Sonic, LLC*, 405 F. Supp. 3d 676, 688 (W.D. Tex. 2019), the court determined that a thirty-pound lifting restriction was sufficient to create a jury question on "substantially limited."  In *Mercado Cordova v. Walmart Puerto Rico, Inc.,* 369 F. Supp. 3d 336, 353 (D.P.R. 2019), the court found likewise for a ten-pound lifting restriction.  In *Gardea v. JBS USA L.L.C.*, No. 4:15-CV-00474-JAJ, 2017 WL 5904675, at *4 (S.D. Iowa May 11, 2017), *aff'd sub nom. Gardea v. JBS USA, LLC*, 915 F.3d 537 (8th Cir. 2019), the court held that these restrictions were sufficient to get to a jury:  "Waist to floor lifting–35lbs. occasionally; Waist to crown lifting–25lbs. occasionally; Bilateral Carrying– 30 lbs. occasionally; and Right unilateral carrying–15 lbs. occasionally."  In *Rico v. Xcel Energy, Inc*., 893 F. Supp. 2d 1165 (D.N.M. 2012), the court first recognized that "[t]he express language of the ADAA[A] and its interpretative regulations thus call into question the continued precedential value of pre-amendment cases, such as those cited by Defendants," *id.* at 1169, then found that, among other restrictions, a sixty-pound lifting requirement created a sufficient question concerning disability.  *Id.* at 1171.

In contrast, I could not find "sitting" or "standing" cases that were analogous to Plaintiff's; neither were the "working" cases helpful.  However, a plaintiff need only demonstrate one major life activity and "need not [prove] other major life activities in order to be considered [disabled]." *Aubrey v. Koppes*, No. 17-cv-1501-RM-MLC, 2018 WL 296068, at *4 (D. Colo. Jan. 4, 2018) (quoting 42 U.S.C. § 12102(4)(C)).  Thus, if Plaintiff can avoid summary judgment on the major

life activity of "lifting," whether he will be permitted to allege any other activity can await a determination prior to or at trial if raised by the Defendant in a motion in limine or, perhaps, in a Rule 50 motion at the close of Plaintiff's evidence.

In light of the 2008 amendments to the ADA and the cases interpreting them, I do not find the "proper circumstances" here to support summary judgment on issue of the major life activity of lifting. Cases granting summary judgment on this issue post-2008 are very rare. There are facts and decisions favorable to Defendant here. He was working without specific restrictions. Moreover, the record certainly contains facts showing Plaintiff, in the main, continued to do his job without accommodation. In addition, I could find no information in the record comparing Plaintiff to most people in the general population, which the Tenth Circuit appeared to require in *Crowell*.

On the other hand, the record here is papered with specific lifting restrictions, including potentially permanent ones. The independent medical examination in 2017 referenced Plaintiff's limitations on life activities, albeit not severely limiting. These included taking a long time for hygienic care, ability to walk no more than three blocks, inability to sit for more than an hour at a time, inability to drive beyond an hour at a time, and a limitation on yard and house work. He was given a twenty percent whole person impairment. Regarding his working without restriction, the record reflects that Plaintiff was told that if the restrictions the doctors were giving him were true, he could not keep his job. Plaintiff could argue that this prompted him to work when he should not have. Finally, I also cannot find, as a matter of undisputed fact, his restrictions were temporary, as Defendant requests. In fact, my experience leads me to believe back issues are frequently chronic, and the independent medical examination references that he "probably does need permanent restrictions." Finally, to the extent *Crowell* could be read as requiring comparative

information, this was an alternative holding, as the court had already found the plaintiff did not adequately link her alleged inabilities to walk and lift to her allegation of failure to accommodate.

This is not a strong case for disability; indeed, if this were prior to the 2008 amendment, I believe summary judgment would be proper. However, under current law, I must find that the totality of circumstances creates a jury question of whether Plaintiff was substantially limited in a major life activity. Therefore, to the extent the Motion requires me to find that Plaintiff was not disabled, it must be denied.

B. Legitimate, Non-discriminatory Reason for Termination

Defendant argues that even if Plaintiff creates a fact issue on disability, the record establishes he was terminated for legitimate, non-discriminatory reasons. In other words, he was not terminated "under circumstances which give rise to an inference that the termination was based on his disability." To establish a prima facie case of termination based on discrimination, Plaintiff must present "some affirmative evidence that disability was a determining factor in the employer's decision." *Vinez v. Sky Chefs, Inc.*, 658 F. App'x 390, 393 (10th Cir. 2016) (citation omitted).[8] If a plaintiff makes a prima facie case of discrimination, "the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action, upon which the burden shifts back to [plaintiff] to show a genuine issue of material fact whether the employer's proffered reason is pretext for discrimination." *Id.* The ultimate question for summary judgment is whether Plaintiff has "produce[d] sufficient evidence from which a jury could conclude that '[Defendant's]

---

[8] Such affirmative evidence can be direct or circumstantial. *Adams v. Denver Health & Hosp. Auth.*, No. 14-cv-02627-MSK-KLM, 2016 WL 1247732, at *4 (D. Colo. Mar. 30, 2016) (citing *Gross v. FBL Fin. Serv., Inc.*, 557 U.S. 167, 178–79 (2009)).

stated reason for [Plaintiff's] rejection was in fact pretext.'" *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003).

Here, Defendant has offered as its bases for termination Plaintiff's allegedly unsafe and dangerous behavior on July 28, 2017, which violated company policies, coupled with a "pattern of complaints against Plaintiff regarding his behavior towards co-workers and contractors, and his dangerous driving and his creation of an unsafe working environment that violated the same policies." Motion at 19. Thus stated, the burden shifts to Plaintiff, who offers several arguments concerning pretext.

C. Evidence of Pretext

First, Plaintiff alleges the decision to discipline him predated the August 14, 2017 division conference. The record indicates that on August 3, 2017, Defendant had determined to discipline Plaintiff, and Plaintiff's doctor was informed of the same. It appears this decision was virtually simultaneous with, or perhaps preceded, Plaintiff's trip to the doctor on that same date. Second, Plaintiff alleges that Denver Water's statements concerning its inability or unwillingness to tolerate work restrictions or lost time demonstrate discriminatory animus. There are references to Defendant's doubt about being able to accommodate Plaintiff's restrictions, his potential loss of his CDL resulting in his job being "vacated," and his 2016 performance evaluation finding deficiencies in his avoiding work restrictions. Third, Plaintiff offers comparator, allegedly non-disabled employees who had accidents or were cited with rude conduct who were not terminated.

The burden on a plaintiff under *McDonnell Douglas* is different for the prima facie case than for showing pretext. In *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 n.6 (10th Cir. 2007), the court stated:

> [T]emporal proximity is sufficient to establish a prima facie case, but not to establish pretext, because the evidentiary burden is different: "The burden of

> establishing a prima facie case [in the *McDonnell Douglas* framework] is not
> onerous. It is because of this relatively lax burden that we allow temporal proximity
> between a protected activity and an adverse action to establish a prima facie case;
> for the same reason, we have not imported this lessened standard to pretext analysis
> where the burden is more demanding and requires a plaintiff to assume the normal
> burden of any plaintiff to prove his or her case at trial."

(citation omitted). "'Pretext can be shown by such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder could rationally find them unworthy of credence and hence infer that the

employer did not act for the asserted non-discriminatory reasons.'" *Bolton v. Sprint/United Mgmt.*

*Co.*, 220 F. App'x 761, 767 (10th Cir. 2007) (citation omitted).

I believe Plaintiff's submission of comparator evidence is insufficient to move the needle

on pretext, because the supposedly analogous situations he posits are too dissimilar. Additionally,

for the reasons stated in *Bolton*, Plaintiff's temporal argument is not persuasive. This leaves

Denver Water's statements and attitudes toward work restrictions. The ultimate question is

whether a jury could *rationally* believe Denver Water's explanation is not credible, when studied

side-by-side with Plaintiff's assertion of the weakness of that explanation. Although on this record

*I* would have a difficult time finding pretext, for purposes of summary judgment, I find a rational

jury could disbelieve Denver Water, primarily for the following reason. Prior to July 2017,

Plaintiff had been accused of rude behavior (twice in 2014); aggressive tailgating coupled with

blowing his horn (2015); creating a work atmosphere that made others uncomfortable (2015);

causing fear in at least one other employee because of his regular outbursts of anger directed at

just about everyone (2016); blowing up at people and creating an unsafe work environment

because he works too fast (2016); exhibiting anger towards other employees and creating an

unpleasant environment (2016); cursing at an employee of another company, screaming, waiting

his hands, thereby creating a negative environment in which no one wants to be around him (2016).

He was thereafter cited with numerous company violations (mostly those noted above) resulting in a suspension (2016).

In light of these serious prior alleged offenses, a jury could rationally believe that simply blowing his horn and waiving his hands at a contractor, without any obscenity and without getting out of his vehicle, was almost a step in a better direction for this Plaintiff. Coupled with the timing of his newest injury (which resulted in extreme restrictions of lifting/carrying only five pounds, requiring another accommodation by Denver Water), a jury could rationally believe that Denver Water started off on a course to discipline Plaintiff but not terminate him, and the intervening injury/restrictions between the events of July 28 and the decision on August 22, 2017 tipped the scale toward termination. I do not believe this is a strong case of disability discrimination, only that Plaintiff has offered enough factual evidence to survive summary judgment.

## II.    **Disability Discrimination**

"[U]nder the 'modified *McDonnell Douglas* burden-shifting framework' governing failure-to-accommodate claims, a plaintiff may establish a prima facie case by demonstrating 'that "(1) [he] is disabled; (2) [he] is otherwise qualified; and (3) [he] requested a plausibly reasonable accommodation."'" *Exby-Stolley v. Bd. of Cty. Comm'rs*, No. 16-1412, – F.3d –, 2020 WL 6304349, at *4 (10th Cir. Oct. 28, 2020) (alterations in original) (citations omitted). If a plaintiff meets this burden, the employer must "present evidence of its inability to accommodate." *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004).

This case raises the interesting question of whether Plaintiff sought a reasonable accommodation involving an essential job function,[9] or whether Plaintiff claims that a particular

---

[9] "The essential functions are those functions that the individual who holds the position must be able to perform unaided or with the assistance of a reasonable accommodation." 29 C.F.R. § Pt. 1630, App.

job requirement was not essential in the first place.  *See Ward v. Wal-Mart Stores*, *Inc*., 140 F.

Supp. 2d 1220, 1225 n.5, 1228 (D.N.M. 2001) (discussing the difference and finding that because

the only job function at issue was not an essential one, summary judgment was not appropriate).

If Plaintiff establishes that the heavy lifting he was required to perform on July 31, 2017 was not

an essential function of his job but rather a collateral duty, then his request to be excused from it

could certainly be found by a jury as a reasonable request for accommodation.  If it was an essential

function and Plaintiff could not perform it then or any other time, the question would arise whether

he was qualified for his position.  In either event, the record is insufficient to enter summary

judgment on this issue.

　　　　As isolated as the incident may be, Plaintiff has presented direct evidence of a failure to

accommodate a disability when, on July 31, 2017, he told his supervisors he could not engage in

certain duties, and they did not release him from those duties.  His deposition at page 217 and his

declaration October 16, 2020 are unequivocal on that point.  There is evidence that the work that

Plaintiff unwillingly performed at that time resulted in exacerbation of his back injury.  He has

also represented that the employer-imposed duties on July 31, 2017 that Plaintiff expressed were

beyond his capabilities were not even within his job description, *i.e.*, they were not even an

essential function of his job.  This is a fact issue that precludes summary judgment.

　　　　Defendant alleges that Plaintiff's expressed inability to perform the job is not a request for

accommodation and does not suffice for the requirement of engaging in an "interactive process."

I do not see how he could have better expressed himself than informing his employer he cannot

physically perform a certain task.  "Even though 'the notice or request does not have to be in

writing, be made by the employee, or formally invoke the magic words "reasonable

accommodation," it nonetheless must make clear that the employee wants assistance for his or her

disability.'"   *Nunez v. Lifetime Prod., Inc.*, 725 F. App'x 628, 631–32 (10th Cir. 2018). Again, while not a model of a failure to accommodate claim, it creates a fact issue. Therefore, summary judgment must be denied on this basis.

### III.   Retaliation

To establish a prima facie case of retaliation under the ADAAA, a plaintiff must demonstrate "'(1) [ ]he engaged in protected opposition to discrimination; (2) a reasonable employee would have found h[is] employer's subsequent action to be materially adverse; and (3) a causal connection exists between h[is] protected activity and the employer's action.'" *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018) (citing *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009)).

Unlike his other claims, I believe there is insufficient evidence for a jury to find retaliation. The record contains no direct or circumstantial evidence that Plaintiff's suggestion on July 31, 2017 that he could not do heavy lifting was the cause of any action by Defendant thereafter. Therefore, Plaintiff fails at the third element. In addition, even if Plaintiff could establish a prima facie case, Defendant has, as noted above, articulated a legitimate, nondiscriminatory reason for its actions in recommending Plaintiff for discipline. At the very least, unlike with his disability claim, Plaintiff fails in his increased factual burden of showing pretext for retaliation. Plaintiff points to no evidence demonstrating such a weakness, implausibility, inconsistency, incoherency, or contradiction in Denver Water's proffered legitimate reasons that a reasonable factfinder could rationally find them unworthy of credence. A rational jury could not find retaliation on these facts.

## **CONCLUSION**

Accordingly, Denver Water's Motion for Summary Judgment [filed September 25, 2020; ECF 83] is **granted in part** and **denied in part**.  The Motion is granted as to the retaliation claim and denied as to the disability discrimination and failure to accommodate claims.

SO ORDERED.

Dated at Denver, Colorado, this 23rd day of November, 2020.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge